# ▥ Anapol Schwartz

## ATTORNEYS AT LAW

Barry Hill
89 12th Street
Wheeling WV 26003
304.233.4966 phone
304.233.4969 fax
bhill@anapolschwartz.com email

1710 Spruce Street
Philadelphia, PA 19103

1040 Kings Highway North
Suite 304
Cherry Hill, NJ 08034

252 Boas Street
Harrisburg, PA 17102

146 North 6th Street
Reading, PA 19601

230 North Monroe Street
Media, PA 19063

89 12th Street
Wheeling, WV 26003

866-735-2792 Toll Free

www.AnapolSchwartz.com

July 31, 2009

Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E.
Room G-255, North Lobby
Washington, DC 20002-8004

      **Subject:    In re Hydroxycut Sales Practices Litigation
                MDL Docket No. 2087**

Dear Sir/Madam:

    This office, along with Jacobson Schrinsky & Houck, represents Plaintiffs Marques Park and Dawn Parke with regard to the above-referenced matter. Enclosed please find an original and four copies Plaintiffs Marques Parke and Dawn Parke's Response to Plaintiffs Cody Coleman, Randall Scott Shortridge, Kim Ann Walden, Nicholas Torres, Andrew Rossi, and Courtney J. Walker's Joint Motion for Coordination and Transfer Pursuant to 28 U.S.C. §1407.

    Thank you for your attention to this matter. Should you have any questions, please feel free to contact me.

                      Yours for clearer communications,

                      *Kathi Eastham*

                      Kathi Eastham, Legal Assistant

/ke

Enclosures

cc: All counsel on Certificate of Service

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

In re: HYDROXYCUT SALES PRACTICES
LITIGATION

MDL No. 2087

In re: HYDROXYCUT PRODUCT LIABILITY
LITIGATION

PLAINTIFFS MARQUES PARKE AND DAWN PARKE'S RESPONSE TO PLAINTIFFS
CODY COLEMAN, RANDALL SCOTT SHORTRIDGE, KIM ANN WALDEN,
NICHOLAS TORRES, ANDREW ROSSI, AND COURTNEY J. WALKER'S
JOINT MOTION FOR COORDINATION AND TRANSFER PURSUANT TO
28 U.S.C. §1407

### I. INTRODUCTION

Plaintiffs, Marques Parke and Dawn Parke ("Movants" or "Plaintiffs") jointly submit this memorandum of law in support of the application of an MDL but in opposition to the choice of San Diego, and instead to: (a) create this MDL in the Southern District of New York; and (b) coordinate the actions for pretrial proceedings pursuant to 28 U.S.C. §1407(a). The actions at issue satisfy the statutory prerequisites for transfer and coordination as (1) "they involve one or more common questions of fact" being substantially similar actions filed within a short time of each other in districts across the country; (2) transfer and coordination "will promote the just and efficient conduct of [the] actions" by ensuring centralized oversight of pretrial proceedings in what are likely to be highly complex and document-intensive actions, and so minimize waste and inefficiency in the conduct of discovery. *Id.*

The various Hydroxycut cases not pending in district courts across the country allege defendants manufactured, marketed and sold dangerous and/or ineffective weight-loss

supplement products in violation of product liability common law and state consumer protection statutes (the "Hydroxycut Cases").

The *Coleman et al* Plaintiffs advocate a transfer of the MDL to the Southern District of California. We agree with all of the arguments they posit regarding consolidation of the cases now pending in district courts across the country. There are indeed ample reasons to consolidate these cases. However, Plaintiffs disagree that the Southern District of California is the best choice for transfer of venue. For the numerous reasons explained *infra* Plaintiffs move to transfer these actions to the Southern District of New York.

## I. ARGUMENT

### A. These Actions are Appropriate for Transfer and Coordination Pursuant to §1407

The Panel may transfer and coordinate two or more civil cases for pretrial proceedings upon a determination that the cases "involv[e] one or more common questions of fact," transfer and coordination would further "the convenience of parties and the witnesses," and transfer and coordination will "promote the just and efficient conduct of [the] actions." 28 U.S.C. §1407(a). As set forth herein, the pending cases easily meet these criteria and should be transferred and coordinated for pretrial proceedings.

### B. The Panel Should Transfer These Actions to the Southern District of New York

The Panel's determination of the appropriate venue in which to coordinate the pretrial proceedings in these related actions is similarly guided by §1407. Following this standard in the instant situation, the Southern District of New York emerges as superior to the other districts in which related cases have been filed because it possesses a significant nexus to this litigation and best promotes and serves the convenience of the parties and witnesses and the just and efficient conduct of the actions. *See* U.S.C. §1407(a).

### 1.   The Southern District of New York Is an Appropriate Forum for the Hydroxycut Cases

The *Parke* complaint, while filed in the Western District of Wisconsin, we believe is best served in the Southern District of New York for the reasons set forth in the Jack Levy and Elena Levy response to the joint motion for coordination and transfer. Moreover, at least one other case, the *Robertson v. Iovate Health Sciences* (09-cv-9334) case is also pending in the S.D.N.Y. The *Parke* case alleged that the defendant proximately caused serious personal injury, to-wit acute hepatitis with submassive necrosis of the liver and jaundice, by selling a dangerous and defective product without warnings of the product's risks and advertising and marketing their Hydroxycut-branded products containing major misrepresentations and omissions concerning safety. The *Coleman* Plaintiffs advocate transfer to San Diego based on coordinating the "earliest filed" actions. *See In re Refined Petroleum Prods. Antitrust Litig.*, 528 F. Supp. 2d 1365, 1367 (J.P.M.L. 2007). However, this argument is unpersuasive as these class actions "assert consumer fraud and false advertising claims." Whether an action is the earliest one filed is irrelevant when it will not "eliminate duplicative discovery; prevent inconsistent pretrial rulings... and conserve the resources of the parties..." *In re Refined Petroleum Prods. Antitrust Litig.*, 528 F.Supp. at 1366.

With all due respect to the Coleman consumer class claims, this product was removed from the market for serious safety reasons and the persons most affected are those who suffered severe injury, not a consumer who used the product and is fine, but seeks a refund. The gravamen of the consumer fraud class action is certainly less compelling, especially when dealing with a defendant that is likely to have insufficient assets and insurance, based upon the prior experience with its predecessor in the stunningly similar *In Re: Ephedra* litigation. At most, the consumer

fraud and false advertising class actions should be regarded as incidental cases and should not be the principal claims dictating the litigation.

In light of the *Levy* and *Robertson* filing, both of which are pending in the Southern District of New York, and in light of the fact that both suffered serious injuries, we believe this litigation is better suited in that district.

Judicial economy should inform the Panel's analysis of transfer and consolidation. *Cirulli v. Bausch & Lomb*, No. 08-4579, 2009 WL 545572, at \*3. For example, a compelling factor for such analysis is the factual similarities of the different cases. *Id.* Given the gravity of the injuries suffered by Levy and other personal injury plaintiffs, the judicial economy factor for deciding consolidation and transfer of venue should be based in large part on the type of pre-trial discovery necessary for complex personal injury product liability cases. *See In re Refined*, 528 F.Supp. at 1366. Moreover, Levy's injuries align with the FDA's basis for withdrawal. Just because California counsel caption their memorandum of law as "In re Hydroxycut Sales and Practices Litigation," does not mean that their consumer fraud class action should trump the products liability actions of those victims severely injured from using Hydroxycut products.

## 2. Transfer to the Southern District of New York Serves the Interests of the Litigants

The Southern District of New York courthouse in Manhattan is a more convenient location for the parties. *In re Aftermarket Filters Antitrust Litig.*, 572 F.Supp. 2d 1373, 1374 (J.P.M.L. 2008) ("[A]ctions are already pending in this district before one judge, and plaintiffs in numerous actions pending in this district and elsewhere support the Northern District of Illinois as their first or second choice for transferee district. Considerations of convenience and accessibility also favor the Northern District of Illinois.") While San Diego is a major city, New York is more convenient. Not only is New York served by all major airlines at its *three* airports,

it is conveniently located for transit by train, in the heavily populated northeast corridor, it is centrally located with a plethora of hotels, and it is in the region of the country from which defendants and their affiliates conduct business.

The North East Coast, not the West Coast, is the region where Iovate and its affiliates, the manufacturers of Hydroxycut, are located. While Iovate is a Canadian corporation, Iovate's United States headquarters is Blasdell, New York. Vitaquest, a contract manufacturer of Hydroxycut, is a New Jersey corporation, located in West Caldwell, New Jersey, across the river from Manhattan and the Southern District of New York. Defendant GNC is also a North East Coast corporation. GNC is headquartered in Pennsylvania, registered in New York County, and incorporated in Delaware. Additionally, GNC Franchising, LLC regularly does business in the State and County of New York and is a business entity of Pennsylvania. GN OLDCO Corp, is a Pennsylvania business entity as is General Nutrition Corporation. GNCI OLDCO, Inc. is a Delaware business entity and regularly does business in the state of New York. Clearly none of these defendants is domiciled anywhere near California.

New York is also the location from which the FDA will be monitoring the recall of Iovate's defective Hydroxycut product-line. *See* Exhibit A in which the Director of the FDA Center for Food Safety and Applied Nutrition, Stephen F. Sundlof, writes to Iovate's Terry Begley on April 30, 2009, stating "The New York District Office [of the FDA] will be monitoring the recall. The New York District Recall Coordinator is Maria Caride. She can be contacted at (718) 662-5447." *Id.*

Considering the previous nefarious conduct of defendants in the earlier Hydroxycut lines of cases, where defendants lacked sufficient assets to compensate injured victims, and instead filed for bankruptcy, and had its new entity reformulate yet another defective and dangerous product,

transfer to the Southern District of New York is appropriate where defendants will more easily
be monitored.

### 3. Transfer to the Southern District of New York Before the
### Judge Who Supervised the related Ephedra MDL Would Best
### Promote the Just and Efficient Conduct of the Actions

Transfer of the related proceedings to the Southern District of New York would further the
interests of the just and efficient conduct of the actions. The Southern District of New York is
well-qualified to handle cases of the size and complexity of the instant actions.

The *In Re: Ephedra* MDL that is largely resolved, but still partially pending before The
Honorable Judge Rakoff involves strikingly similar scientific causation issues, and overlapping
parties. It is submitted that given Judge Rakoff's extraordinary familiarity on these key issues,
having held extensive *Daubert* hearings in *In re Ephedra Prod. Liab. Litig.*, 393 F.Supp. 2d 181
(2005); *In re Ephedra Prod. Liab. Litig.*, 478 F.Supp.2d 624, 632-33 (2007); *In re Ephedra
Prod. Liab. Litig.*, No. 06 Civ. 13046, 2007 WL 2947451, at *1-2., it would further judicial
efficiency if he is appointed as the Judge.

Thus, the Southern District of New York is the best venue for pretrial litigation of the
overlapping cases.

## III. TRANSFER TO NEW YORK WOULD FACILITATE FEDERAL-STATE COORDINATION

Transfer to the Southern District of New York is desirable to enhance federal and state court
coordination. *In re Zyprexa Prod. Liab. Litig.*, 489 F.Supp.2d 230, 237-38 ("Cooperation
between federal and state courts has been encouraged at all states of the Zyprexa litigation.");
*see, e.g., In re Zyprexa Prods. Liab. Litig.*, 467 F.Supp.2d 256, 262 (E.D.N.Y. 2006)
("Cooperation with state courts will continue to be stressed."); *In re Zyprexa Prods. Liab. Litig.*,
No. MDL 1596, 2006 WL 898105, at *1 (E.D.N.Y. Apr. 16, 2006) ("Coordination and

cooperation between state and federal courts has been encouraged."); *In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-1596, 2006 WL 197151 (E.D.N.Y. Jan. 30, 2006) (letter to state judges with Zyprexa cases from federal MDL judge suggesting coordination and cooperation); *In re Zyprexa Liab. Litig.*, No. MDL 1596, 2004 WL 3520248, at *4 (E.D.N.Y. Aug. 18, 2004) (directing defendant Lilly and PSCI to "confer regarding procedures for coordination of state court discovery with discovery in this MDL").

Defendant Iovate is a corporation from Blasdell, New York. There will likely be numerous parallel claims against Iovate in New York State Court by New York plaintiffs (who cannot bring suit in federal court because they lack diversity) represented by local New York counsel. Transfer of venue to the Southern District of New York is the perfect opportunity to facilitate the same cooperation between federal and state courts that expedited the Zyprexa litigation. *In re Zyprexa*, 489 F.Supp.2d 230, 237-37.

The Southern District of New York is also the best choice for venue because the Southern District is a tried and true locale for the court-appreciated device of the joint Frye/Daubert hearing. Indeed, for convenience's sake, the joint Frye/Daubert hearing for both the federal and state standards of causation is a growing trend. *In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, 524 F.Supp.2d 1166, 1171; *In re Neurontin Mktg,. Sales Practices, and Prod. Liab. Litig.*, MDL No. 1629, 2009 WL 121944, at *1 n.3 (D.Mass. May 5, 2009) ("The importance of coordination of related claims in federal and state litigations has increasingly been recognized. (Manual for Complex Litigation (Fourth) §20 (2004)). The joint hearing was held in furtherance of this goal and with a view to reducing costs, delays, and duplication of effort. (*See id.* at §20.31). In addition, with the knowledge and consent of the parties, the federal and

state courts have conferred on the issues raised in the *Frye/Daubert* hearing."); *see In re Bextra and Celebrex*, 2008 N.Y. Misc. LEXIS 720, at *11; *See also* Exhibit 6.

The best way to facilitate federal and state cooperation and judicial economy, is for this Honorable Panel to consolidate and transfer Hydroxycut into an MDL venued in the Southern District of New York.

Dated: July 31, 2009

Respectfully submitted:

Barry Hill
Anapol Schwartz Weiss Cohan Feldman & Smalley PC
89 12th Street
Wheeling, WV 26003
304.233.4966 phone
bhill@anapolschwartz.com email

Thomas R. Anapol
Anapol Schwartz Weiss Cohan Feldman & Smalley PC
1710 Spruce Street
Philadelphia, PA 19103
215.735.1130 phone
tanapol@anapolschwartz.com email

Thomas K. Houck
Jacobson Schrinsky & Houck, S.C.
759 North Milwaukee Street, Suite 316
Milwaukee, Wisconsin
414.223.4444 phone
thouck@jsh-law.com email

By: _____
Barry Hill

# News & Events

## FDA Letter to Iovate Health Sciences, April 30, 2009

PDF Version (384 KB)

Department of Health and Human Services
Public Health Service
Food and Drug Administration
College Park, MD 20740

April 30, 2009

Mr. Terry Begley
Iovate Health Sciences, Inc.
381 North Service Road, West
Oakville, Ontario Canada L6M 0H4

Dear Mr. Begley:

On March 31, 2009, the U.S. Food and Drug Administration (FDA or the Agency) informed you during a meeting of concerns that the Agency has about liver toxicity associated with the use of multiple versions of the dietary supplement Hydroxycut marketed by your firm under the Iovate and MuscleTech brand names. Based on adverse events reported to FDA, case reports in the peer-reviewed literature, and in a case series described by hepatologists to FDA, the Agency has concluded that the ingestion of the dietary supplement Hydroxycut presents a severe potentially life-threatening hazard to some users. In a telephone conversation on April 29, 2009, between [ **(b)(4)** ] , outside counsel for Iovate Health Sciences, Inc., and Mr. Eric Blumberg, Deputy Chief Counsel, Litigation, Office of Chief Counsel, FDA, the Agency explained our conclusions about the safety of your firm's Hydroxycut products[1] and the additional actions that the FDA expected your firm to take in response to the serious public health hazards presented by the Hydroxycut dietary supplements marketed by your firm. Following that call, your counsel advised Mr. Blumberg that the firm had agreed to recall all Hydroxycut products. The information provided by your counsel expanded the scope of your recall to include your drink mixes as well as the caplet products that your counsel had previously indicated to us that you intended to recall.

Hydroxycut products have been marketed by Iovate Health Sciences, Inc (381 North Service Rd. W., Oakville, ON L6M 0H4, Canada) and by Muscletech (Mississauga, Ontario, Canada) and distributed by Iovate Health Sciences USA,



EXHIBIT

**A**

Inc. (Blassdell, NY, USA) as weight control, fat-burner, and energy enhancement dietary supplements. Hydroxycut products bear the Iovate or Musletech Brand names. The products contain a variety of ingredients as well as numerous proprietary blends such as "Hydroxagen Plus," "Hydroxy Tea," "HydroxyTea CF," "Hydroxycut Proprietary Blend," "Max! Liqui-Burn," "Max! Weight-Loss Matrix," "Hydroxycut Hardcore Proprietary Blend Proxyclene," "Noreidrol Intensity focus Blend," "Lasidrate Delivery Blend," "or Yohimbacore." The products' labels declare minerals and herbs as well as extracts from *Garcinia cambogia*, *Guarana*, *gymnema sylvestre*, *Rhodiola rosea*, and *Camellia sinensis*. Prior to 2004, Hydroxycut, contained ephedra or Ma Huang as an ingredient; however, you stated to us in our meeting that by the beginning of 2004, Hydroxycut was ephedra-free. Subsequent to the removal of ephedra, Hydroxycut has undergone numerous formulation changes.

In 2002, the Center for Food Safety and Applied Nutrition's (CFSAN) adverse event reporting system, CAERS, began receiving reports of liver-related illnesses in persons who reported consuming the dietary supplement Hydroxycut capsules/caplets for periods ranging from as short as a week to two (2) months. Since the earlier formulation of Hydroxycut contained ephedra, it was generally believed that the reports of liver injury associated with the use of the product were due either to ephedra or a combination of the ingredients found in the product. However, following the removal of ephedra from Hydroxycut capsules/caplets, CFSAN continued to receive reports of liver injury associated with the use of Hydroxycut capsules/caplets. In addition, CFSAN became aware of reports of Hydroxycut-associated liver toxicity published in the peer-reviewed literature and received communications from independent hepatologists regarding cases of liver toxicity associated with the use of the Hydroxycut capsules/caplets.

**Hydroxycut-associated liver toxicity reports in CAERS**. To-date, 23 case reports of Hydroxycut-associated liver toxicity have been identified in CAERS for the period 2002 to the present. The number of reports, by event date, is listed below:

| Year of event | Number of reports |
|---|---|
| 2002 | 4 |
| 2003 | 3 |
| 2004 | 6 |
| 2005 | 0 |
| 2006 | 1 |
| 2007 | 6 |
| 2008 | 3 |

| 2009      | 0  |
|-----------|----|
| **Total** | 23 |

For cases in which gender was known, 15 (65%) were female. Ages ranged from 20 years to 51 years (median = 29 years). Sixteen cases (70%) were hospitalized. The majority of cases reported no underlying risk factors for liver disease (e.g., no history of viral hepatitis, no HIV infection, no autoimmune diseases). Although the reports vary in detail, several reports describe work-ups that ruled out infectious, autoimmune, and metabolic causes of liver disease. The severity of illness ranged from asymptomatic elevations in serum bilirubin to acute liver failure (one patient received a liver transplant in 2002, a second patient was reportedly waiting for a liver transplant in 2004) to one death. On March 24, 2009, CFSAN received information regarding the fatal case. The patient was a 20-year-old male who presented to an emergency room on January 19, 2007 in liver failure and hepatic encephalopathy. He was subsequently transferred to a liver transplant center where, in the operating room, he was found to have necrosis of both the large and small intestines. Given these findings, the procedure was aborted and the patient was returned to the intensive care unit. He died on February 12, 2007.

**Reports of Hydroxycut-associated liver toxicity in the peer-reviewed literature**. To our knowledge, there are four published reports in the peer-reviewed literature that describe liver disease that occurred in six persons following the consumption of Hydroxycut capsules/ caplets[2] [3] [4] [5]

The aforementioned cases are consistent with the diagnosis of idiosyncratic hepatotoxicity for a number of reasons: the temporal relationship between the consumption of Hydroxycut capsules/caplets and the development of acute liver injury in persons who had no history of known liver disease; the exclusion of other causes of liver disease following extensive work-ups; the resolution of liver injury upon discontinuation of Hydroxycut capsules/caplets; and the development of liver injury is not dose dependent. Also apparent were two distinct patterns of liver injury: cholestatic and necrotic. It is not unusual for a single herbal preparation to produce more than one type of clinicopathologic liver injury[6].

**Discussions with hepatologists**. In discussions in March and April 2009 with hepatologists Tse-Ling Fong, M.D. of the University of Southern California, and William Lee, M.D. of the University of Texas Southwestern Medical Center, CFSAN has become aware of these physicians' case series of patients with severe liver disease associated with the use of Hydroxycut capsules/caplets. Two cases from this series, representing additional cases to the ones reported to CFSAN, underwent liver transplantation following acute liver failure.

**Serious non-hepatic adverse events identified in the CAERS database or**

**the literature.** When the CAERS database was queried for other serious adverse events associated with Hydroxycut, cases of seizures, rhabdomyolysis,[7] and cardiovascular disorders were identified. For example, from 2004 to 2008, the CAERS database received four case reports describing consumers who experienced a seizure following ingestion of Hydroxycut. In one instance, a 26-year-old consumer increased her daily intake of Hydroxycut from 2 to 4 caplets on December 6, 2008. At 2 p.m. that day, following ingestion of the second serving of 2 caplets, the consumer felt tired and lay down. She was found by another person to be having a "seizure" (shaking and drooling). The consumer was taken to the emergency room where a physician told her to discontinue using Hydroxycut. The case report describing rhabdomyolysis involved a 23-year-old male who had been consuming Hydroxycut on and off over an eight-month period in 2002. On the day of hospital admission, he had taken 2 tablets for energy prior to working out. He reported feeling nausea, and then several hours later, he had severe shoulder pain and dark urine. He was diagnosed as having rhabdomyolysis on admission to the hospital. In addition to this CAERS report, CFSAN is aware of one case of Hydroxycut capsules/caplets-associated rhabdomyolysis reported in the peer-reviewed literature. In this report, Dehoney and Wellen described an 18-year-old male who experienced rhabdomyolysis after consuming Hydroxycut as per the product's instructions. During his overnight hospitalization, he received 6 liters of fluid before discharge.[8]

The Agency also identified 46 reports in CAERS of Hydroxycut capsules/caplets-associated cardiovascular adverse events. These events ranged in severity from palpitations to a heart attack. Nineteen of these reports were received during or after 2004, a period when Hydroxycut's formulation was believed to be free of ephedra.

## Conclusion:

Three lines of evidence derived from multiple disparate sources suggest it is very likely that exposure to Hydroxycut capsules/caplets can cause idiosyncratic hepatotoxicity. First, many of the subjects described in the adverse event reports to CAERS, in the peer-reviewed literature, and in the case series described by hepatologists reported no history of liver disease or risk factors for liver disease (e.g., alcohol consumption, previous viral infection, hereditary factors, etc.) prior to experiencing liver injury following the ingestion of Hydroxycut capsules/caplets. Second, in many subjects, thorough diagnostic evaluations performed in multiple settings ruled out a number of known causes of liver disease, including viral hepatitis, autoimmune diseases, and metabolic/inherited disorders. Third, prompt resolution of liver disease occurred in a number of patients following cessation of Hydroxycut capsules/caplets ingestion. While some adverse event reports involved users who had consumed more than the daily dosage recommended on the products' labeling, if these reports were excluded from consideration, the remaining evidence demonstrates liver-related adverse effects following exposure to Hydroxycut capsules/caplets. In addition to Hydroxycut capsules/caplets-

associated liver-related adverse effects, CFSAN is aware of a number of CAERS reports that describe seizures, rhabdomyolysis, and cardiovascular signs and symptoms.

The Agency does not know which ingredient(s) of Hydroxycut formulations are responsible for producing liver toxicity. In addition, there is insufficient information to determine whether there is a dose-response effect between Hydroxycut capsules/caplets ingestion or whether its effects are cumulative over time. However, based on the totality of evidence presented above, the Agency concludes that the ingestion of the dietary supplement, Hydroxycut, presents a severe potentially life-threatening hazard to some users. Although Hydroxycut–induced hepatotoxicity has been reversible in most patients that have come to the attention of CFSAN, in certain instances acute liver failure has resulted that has required liver transplantation for survival; death occurred in one instance prior to transplantation.

While the firm believes that the lack of reported adverse events associated with the use of the Hydroxycut shot product and the drink mixes is evidence that they are safe, FDA disagrees. The reports of acute liver injury in individuals who have consumed Hydroxycut capsules/caplets represent idosyncratic reactions, meaning that the injuries have occurred as a result of conditions peculiar to the affected individuals. As such, the incidence of injuries of this nature is unpredictable and may result from peculiar metabolic interactions between one or more Hydroxycut ingredient and the host's physiologic system. There are no data to indicate that the dose or duration of use of any particular Hydroxycut ingredient, or the gender, or any other identifiable trait of a Hydroxycut user predicts the risk of an adverse event. In light of this, and because the fact that the drink mixes and 'shot' products share ingredients with products known to be associated with adverse events, and because it is unknown which ingredient(s) of Hydroxycut are responsible for producing the idiosyncratic reactions, we believe that the reasonable conclusion to be drawn is that these products present the same risks as the Hydroxycut capsules/caplets.

Given the seriousness of the hazard presented by Hydroxycut, Iovate Health Sciences, Inc. voluntarily agreed to the following:

1. To cease distribution of all existing formulations of Hydroxycut.

2. To recall from the marketplace, to the consumer/user level, all existing formulations of Hydroxycut.

As we stated above, the ingestion of the dietary supplement Hydroxycut presents a severe potentially life-threatening hazard to some users. FDA considers the recalled products to be adulterated under section 402(f)(1)(A) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. § 342(f)(1)(A)] (the Act) in that the dietary supplements present a significant or unreasonable risk of illness or injury under

conditions of use recommended or suggested in labeling.

The New York District Office will be monitoring the recall. The New York District Recall Coordinator is Maria Caride. She can be contacted at (718) 662-5447.

We are aware that Iovate Health Sciences, Inc. plans to reformulate the Hydroxycut product line. As discussed above, we have been unable to identify which specific ingredient or combination of ingredients can be identified as the cause of the hepatotoxicity, cardiotoxicity, seizures, or rhabdomyolysis associated with the use of the existing formulations. Under the Act, you are responsible for ensuring that a dietary supplement you market is safe within the meaning of the Act. We expect that any reformulated Hydroxycut products that contain any of the ingredients present in the existing Hydroxycut formulations would be the subject of a rigorous safety review and that a determination that the formulation(s) of the new products do not present a significant or unreasonable risk or illness or injury under the conditions of use recommended or suggested in labeling is supported by scientific evidence. We suggest that sharing the safety evaluation for the new formulation(s) with FDA will enable us to better respond to inquiries we receive concerning the safety of the new formulation(s). Further, unless each ingredient used in your new formulation(s) is affirmatively documented to have been marketed as a dietary ingredient in the United States before October 15, 1994, you may be required to submit to FDA the notification required by 21 U.S.C.§ 350b(a)(2) and 21 CFR § 190.6 at least 75 days before the reformulated product (s) are introduced into interstate commerce. If you believe you do not need to submit a 75 day notification, please provide FDA with documentation to support your determination.

Should you have any questions or comments about the contents of this letter or any aspects of your responsibilities pertaining to the marketing of your products, you may contact Dr. Vasilios Frankos at (301) 436-2375.

Sincerely yours,

/s/

Stephen F. Sundlof
Director
Center for Food Safety
and Applied Nutrition

cc: [ (b)(4) ]

## Footnotes

[1] Hydroxycut products, for purposes of this letter, means Hydroxycut Regular

Rapid Release caplets, Hydroxycut Hardcore Liquid caplets, Hydroxycut Max Liquid caplets, Hydroxycut Caffeine-Free Rapid Release caplets, Hydroxycut Regular drink packets, Hydroxycut Hardcore drink packets (Ignition Stix), Hydroxycut Caffeine-Free drink packets, Hydroxycut Max drink packets, Hydroxycut Liquid Shots, Hydroxycut Hardcore RTDs, Hydroxycut Max Aqua Shed, Hydroxycut 24, Hydroxycut Carb Control, and Hydroxycut Natural.

[2] Stevens T, Qadri A, Zein NN. Two patients with acute liver injury associated with use of the herbal weight-loss supplement Hydroxycut. *Ann Intern Med* 2005;142:477-8.

[3] Jones FJ, Andrews AH. Acute liver injury associated with the herbal supplement Hydroxycut in a soldier deployed to Iraq. *Am J Gastroenterol* 2007;102:2357.

[4] Dara L, Hewett J, Lim JK. Hydroxycut hepatotoxicity: A case series and review of liver toxicity from herbal weight loss supplements. *World J Gastroenterol* 2008;14:6999-7004.

[5] Shim M, Saab S. Severe hepatotoxicity due to Hydroxycut: a case report. *Dig Dis Sci* 2009 Feb;54(2):406-8. Epub 2008 Jul 26.

[6] Miller SC. Safety concerns regarding ephedrine-type alkaloid-containing dietary supplements. *Mil Med* 2004;169:87-93.

[7] An acute, fulminating, potentially fatal disease of skeletal muscle that entails destruction of skeletal muscle as evidenced by myoglobinemia and myoglobinuria (Stedman's Medical Dictionary, 26th ed., Williams & Wilkins, Baltimore; 1995.

[8] Dehoney S, Wellein M. Rhabdomyolysis associated with the nutritional supplement Hydroxycut. *Am J Health Syst Pharm* 2009 Jan 15;66(2):142-86.

BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

In Re HYDROXYCUT SALES PRACTICES          )        MDL No. 2087
LITIGATION                                )
                                          )
_____ )
In Re:  HYDROXYCUT PRODUCTS LIABILITY     )
LITIGATION                                )
                                          )
_____ )

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Plaintiffs Marques Parke and Dawn
Parke's Response To Plaintiffs Cody Coleman, Randall Scott Shortridge, Kim Ann
Walden, Nicholas Torres, Andrew Rossi, And Courtney J. Walker's Joint Motion For
Coordination And Transfer Pursuant To 28 U.S.C. §1407 was served by First Class Mail
on July 31, 2009, to the following:

Clerk of the Court
**Middle District of Alabama**
Ms. Debra P. Hackett
One Church Street
Montgomery, AL 36104

Clerk of the Court
**District of Arizona**
130 Sandra Day O'Connor
United States Courthouse
401 West Washington Street
Phoenix, AZ 85003-2146

Clerk of the Court
**Northern District of California**
Phillip Burton United States
Courthouse, 16th Floor
450 Golden Gate Avenue
San Francisco, CA 94102-3434

Clerk of the Court
**Northern District of Alabama**
140 Hugo L. Black
United States Courthouse
1729 Fifth Avenue North
Birmingham, AL 35203-2000

Clerk of the Court
**Eastern District of California**
4-200 Robert T. Matsui
United States Courthouse
501 I Street
Sacramento, CA 95814-7300

Clerk of the Court
**Southern District of California**
Edward J. Schwartz Federal Bldg.
Suite 4290
880 Front Street
San Diego, CA 92101

1

Clerk of the Court
**Middle District of Florida**
United States Courthouse
401 West Central Blvd.
Orlando, FL 32801

Clerk of the Court
**Northern District of Illinois**
Everett McKinley Dirksen
United States Courthouse, 20th Fl.
219 South Dearborn Street
Chicago, IL 60604

Clerk of the Court
**District of Massachusetts**
John Joseph Moakley United States
Courthouse, Suite 2300
One Courthouse Way
Boston, MA 02210-3002

Clerk of the Court
**District of New Jersey**
4015 Martin Luther King, Jr.
Federal Building and US Courthouse
50 Walnut Street
Newark, NJ 07102

Clerk of the Court
Middle District of Tennessee
800 Estes Kefauver Federal Bldg.
and United States Courthouse
801 Broadway
Nashville, TN 37203-3816

Clerk of the Court
**Southern District of Florida**
8 Wilkie D. Ferguson, Jr.
United States Courthouse
400 North Miami Avenue
Miami, FL 33128

Clerk of the Court
**Eastern District of Louisiana**
C-151 Hale Boggs Federal Bldg.
United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Clerk of the Court
**Eastern District of Michigan**
Theodore Levin United States
Courthouse, 5th Floor
231 West Lafayette Boulevard
Detroit, MI 48226

Clerk of the Court
**Western District of Pennsylvania**
3110 United States Post Office
and Courthouse
700 Grant Street
Pittsburgh, PA 15219-1906

Clerk of the Court
Western District of Texas
L100 United States Courthouse
111 East Broadway Street
Del Rio, TX 78840

I further certify that a copy of the foregoing Plaintiffs Marques Parke and Dawn Parke's Response To Plaintiffs Cody Coleman, Randall Scott Shortridge, Kim Ann Walden, Nicholas Torres, Andrew Rossi, And Courtney J. Walker's Joint Motion For Coordination And Transfer Pursuant To 28 U.S.C. §1407 was served by First Class Mail on July 31, 2009, to the following counsel and/or parties:

Andrew S. Friedman
Bonnett, Fairbourn, Friedman & Balint, PC
2901 North Central Avneue
Suite 100
Phoenix, AZ 85012-3311
Attorneys for Plaintiffs Cody Coleman,
Andrew Rossi, Randall Scott Shortridge,
Kim Ann Walden and Courtney J. Walker

Allen Woods
Larry Woods
W. Patrick Thurman
Law Offices of Woods & Woods
P.O. Box 128498
Nashville, TN 37212
615-321-1426
Attorneys for Plaintiff Patricia Akin,
Monique Baker, Ruth Epperson,
Cory Flenoy, Nakitta Gamble
and James McClinton

DeWitt M. Shy, Jr.
Taylor A. Cates
Burch, Porter & Johnson, PLLC
130 N. Court Avenue
Memphis, TN 38103
901-524-5165
Attorneys for Defendants Iovate Health
Sciences, USA, Inc., and Iovate Health
Sciences Inc.

E. Kirk Wood, Jr.
Wood Law Firm, LLC
P.O. Box 382434
Birmingham, AL 35238
205-612-0243
Attorney for Plaintiffs Amy Baker,
Kyle Davis and Sara Carreon

Gregory L. Davis
6987 Halcyon Park Drive
Montgomery, AL 36117
334-832-9080
Attorney for Plaintiff Amy Baker

Gray M. Borden
Jere F. White, Jr.
Sara Ann Ford
Lightfoot Franklin & White, LLC
The Clark Building
400 N. 20th Street
Birmingham, AL 35203
Attorneys for Defendant MuscleTech
Research and Development, Inc., Iovate Health
Sciences, USA, Inc. and GNC Corporation,
Wal-Mart Stores, Inc., and CVS Pharmacy Inc.

Eric McCalmon Bosman
Morrison & Foerster, LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
Attorneys for Defendants MuscleTech
Research and Development, Inc., Iovate
Health Sciences, U.S.A., Inc., and
CVS Pharmacy, Inc.

3

Jorge Gonzalez
Arturo Gonzalez
Morrison & Foerster, LLP
425 Market Street
San Francisco, CA 94105
Attorney for Defendants MuscleTech
Research and Development, Inc., Iovate
Health Sciences, U.S.C., Inc., and
CVS Pharmacy, Inc.

Brian J. Devine
Seeger Salvas LLP
601 Montgomery Street, Suite 325
San Francisco, CA 94111
415-981-9260
Attorney for Plaintiff Robert Manley

Kenneth M. Seeger
Seeger Salvas, LLP
455 Market Street, Suite 1530
San Francisco, CA 94105
415-981-9260
Attorney for Plaintiff Robert Manley

Timothy G. Blood
Coughlin Stoia Geller Rudman & Robbins
655 W. Broadway, Suite 1900
San Diego, CA 92101
619-231-1058
Attorney for Plaintiff Andrew Dremak

Douglas A. Kreis
Aylstock Witkin Kreis & Overholtz, PLLC
803 N. Palafox Street
Pensacola, FL 32501
850-916-7450
Attorneys for Plaintiffs Patricia Major and
and Traczjubruthais Walquer

Jonathan Shub
Seeger Weiss LLP
1515 Market Street, Suite 1380
Philadelphia, PA 19102
215-564-2300
Attorney for Plaintiff Robert Manley
and Daniel Johnsen

Eric D. Freed
Freed & Weiss, LLC
111 W. Washington Street, Suite 1331
Chicago, IL 60602
312-220-000
Attorney for Plaintiff Robert Manley

Harold M. Hewell
Hewell Law Firm
105 W. "F" Street, Suite 213
San Diego, CA 92101
619-235-6854
Attorney for Plaintiff Robert Manley
and Connie Williams

Alexandria A. Amezcua
Morrison & Foerster, LLP
425 Market Street
San Francisco, CA 94105
415-268-6557
Attorney for Defendant Iovate Health
Sciences Group, Inc., Iovate Health
Sciences, Inc., Iovate Health Sciences,
U.S.A., Inc., and GNC Corporation

Howard M. Bushman
Lance A. Harke
Sarah C. Engel
Harke & Clasby
155 S. Miami Avenue, Suite 600
Miami, FL 33130
305-536-8220
Attorneys for Plaintiffs Patricia Major and
Traczjubruthais Walquer

4

Neil D. Overholtz
Aylstock Witkin & Sasser
4400 Bayou Boulevard, Suite 58
Pensacola, FL 32503
850-916-7450
Attorney for Plaintiffs Patricia Major and
Traczjubruthais Walquer

Ralph C. Hardesty
55 W. Monroe Street, Suite 3720
Chicago, IL 60603
312-346-0045
Attorneys for Plaintiffs Flor E. Mendoza
And Rene Mendoza

Michael S. Bradner, Jr.
Brandner Law Firm, LLC
4636 Sanford St., Suite 110
Metairie, LA 70006
504-552-5000
Attorney for Plaintiff Enjolie Pennier

Robert W. Orlando
The Orlando Firm, PC
13 Pine Street
Morristown, NJ 07960
866-373-1800
Attorney for Clifford Kafka

Ronald Rodriguez
The Law Offices of Ronald Rodriguez, PC
915 Victoria Street
Laredo, TX 78040
956-796-1000
Attorney for Plaintiffs Patricia Lopez,
Dennis Lopez and Hector Lopez

Gregory S. Hudson
Preis, Kraft & Roy
2000 Bering Drive, Suite 600
Houston, TX 77057
713-355-6062
Attorney for Defendants Iovate Health

Robert D. Kreisman
Kreisman Law Offices
55 W. Monroe Street, Suite 3720
Chicago, IL 60603
312-346-0045
Attorneys for Plaintiffs Flor E. Mendoza and
Rene Mendoza

Jeffrey Berniard
Berniard & Wilson Law Firm, LLC
625 Baronne Street, 2nd Floor
New Orleans, LA 70113
504-615-0583
Attorneys for Plaintiff Enjolie Pennier

Jason J. Thompson
Sommers Schwartz, P.C.
2000 Town Center, Suite 900
Southfield, MI 48075
248-355-0300
Attorney for Plaintiffs Kristen Husby and
Michael Husby

Bruce D. Greenberg
Jason E. MaciasJennifer Sarnelli
Lite, DePalma, Greenberg & Rivas, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102
973-623-3000
Attorneys for Plaintiffs Raymond Ortiz, II
and Melissa Reed

Robert R. Biechlin, Jr.
Michael H. Wallis
Thornton, Biechllin, Segrato, Reynolds
& Guerra, LLC
5th Floor – One International Centre
100 NE Loop 410

Sciences, Inc., Iovate Health Sciences, USA

San Antonio, TX 78216
210-342-5555
Attorneys for Defendants Iovate Health
Sciences, Inc., Iovate Health Sciences,
USA, Bernard T. Swift, Jr., and Marissa
Gomez-Martinez, M.D.

Ronald E. Tigner
Cozen & O'Connor
1221 McKinney Street, Suite 2900
Houston, TX 77010
832-214-3935
Attorneys for Defendants Iovate Health
Sciences, Inc., Iovate Health Sciences, USA

Patrick J. Sheehan
Whatley, Drake & Kallas
28 State Street, 11th Floor
Boston, MA 02109
617-573-5118
Attorney for Plaintiff James Faherty

Paul D. Popeo
Choate, Hall & Stewart
Two International Place
100-150 Oliver Street
Boston, MA 02110
617-248-5000
Attorney for Defendants Iovate health
Sciences, U.S.A., inc., Muscle Tech Research
And Development, Inc., and CVS Pharmacy, Inc.

William C. Wright
The Law offices of William C. Wright, PA
319 Clematis Street, Suite 109
West Palm Beach, FL 33401
561-514-0904
Attorney for Plaintiff Kim Ann Walden

Gene J. Stonebarger
Lindsay & Stonebarger
620 Coolidge Drive, Suite 225
Folsom, CA 95630
916-294-0002
Attorney for Plaintiffs Christopher Lopez
And Alejandro M. Jimenez

Joseph G. Stewart, Jr.
Joseph G. Stewart, Jr., P.C.
P.O. Box 240486
Montgomery, AL 36124
334-263-3552
Attorney for Plaintiff David Chancellor

Joe Kravec, Jr.
John C. Evans
Specter Specter Evans & Manogue, PC
The 26th Floor Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
412-642-2300
Attorneys for Plaintiffs Andrew Rossi and
Nicholas Torres

6

Joe Whatley, Esq.
Whatley Drake & Kallas
1540 Broadway
37th Floor
New York, New York 10036


Dated:        July 31, 2009




_____
Barry Hill
Anapol Schwartz Weiss Cohan Feldman & Smalley
89 12th Street
Wheeling, WV 26003
304.233.4966 phone
bhill@anapolschwartz.com

7